991 So.2d 91 (2008)
Timothy E. PENTON, Jr.
v.
CITY OF HAMMOND POLICE DEPARTMENT.
No. 2007 CA 2352.
Court of Appeal of Louisiana, First Circuit.
May 2, 2008.
*93 W. Chad Stelly, New Orleans, LA, for Plaintiff/Appellant, Timothy E. Penton, Jr.
Jeffrey C. Napolitano, Metairie, LA, for Defendant/Appellee, City of Hammond.
Before WHIPPLE, GUIDRY, and HUGHES, JJ.
WHIPPLE, J.
In this workers' compensation case, claimant, Timothy E. Penton, Jr., appeals from a judgment dismissing his claims against his former employer, the City of Hammond Police Department, based upon the finding that he failed to carry his burden of proving a work-related accident with injury. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On September 11, 2005, Penton was employed full time by the City of Hammond Police Department holding the position of police officer, first class. At approximately 1:00 a.m. on that date, while on patrol, Penton assisted Officer Thad Gautier in chasing a suspect on foot. The suspect had fled from a third officer, Officer Rodney Gemar, who was attempting to arrest the suspect after a traffic stop. Penton saw the suspect coming from a wooded area towards a residential street. Although approaching from different directions, Penton and Officer Gautier reached the suspect at the same time, as they came upon a ditch and fell into it.
According to Penton, while reaching for the suspect, Penton stumbled across the ditch and fell on his chin. He got up and attempted to apprehend the suspect with Officer Gautier. After the suspect was handcuffed, he broke off running again from several officers who had arrived on the scene. The suspect was eventually re-apprehended and transported to the police station.
*94 Although Penton did not report any injuries to the other officer that night, he later contended that he was injured as a result of falling in the ditch during his apprehension of the suspect. He stated that he "eventually" began to feel pain that he associated with the accident and that he "eventually" sought medical treatment. However, he did not report the alleged on-the-job accident and injury to his employer until months later, on February 2, 2006.[1]
On December 5, 2005, Penton called Loretta Severan, the Human Resources *95 Director for the City of Hammond, and mentioned the "possibility" of having sustained a workers' compensation accident, explaining that he had been injured during a police chase. Ms. Severan advised Penton that he should complete an accident report. Despite having been advised to file a report if a work-related claim existed, Penton responded that he "didn't think he wanted to do that right now," and he did not file a report of a job accident with his employer until February 2, 2006.
On the accident report submitted February 2, 2006, the shift supervisor wrote "AT NO TIME DID OFF. PENTON TELL ME OF THIS INCIDENT. HE NEVER STATED HE HURT HIMSELF DURING AN ARREST."[2] On an APR dated January 10, 2006, from a visit with Dr. Chiasson, Penton, for the first time, indicated that the injury occurred "while on duty." Records from the Spine Diagnostic & Pain Treatment Center show that he contended that he "fell while chasing perpetrator at work."
On June 13, 2006, Penton filed a disputed claim for compensation, seeking wage benefits and the authorization of medical treatment. The City of Hammond answered the petition, denying that he sustained an injury during the course and scope of his employment, and that he was entitled to any further benefits.
The matter proceeded to trial before the OWC judge on June 25, 2007. At the conclusion of trial, the OWC judge rendered oral reasons for judgment in favor of the employer, dismissing Penton's claim with full prejudice. On July 13, 2007, a written judgment was signed by the OWC judge in conformity with her ruling that claimant failed to carry his burden of proving that he suffered a work-related accident with injury on September 11, 2005.
Penton appeals, challenging two evidentiary rulings, as well as the OWC judge's finding that he failed to prove that he sustained injuries from a work-related accident.

DISCUSSION

Evidentiary Challenges

(Assignments of Error Nos. 2 & 3)
In these assignments, Penton contends that the OWC judge made various erroneous evidentiary rulings. If a trial court commits evidentiary error that interdicts its fact-finding process, this court must conduct a de novo review. Thus, any alleged evidentiary errors must be addressed first on appeal, inasmuch as a finding of error may affect the applicable standard of review. Breitenbach v. Stroud, XXXX-XXXX (La.App. 1st Cir.2/9/07), 959 So.2d 926, 930.
Penton first argues that the OWC judge erred in quashing the subpoena duces tecum issued at his request, which sought "sick leave records" of a supervisor. He contends the records were relevant and would have substantially called into question the veracity of the supervisor's testimony and would have further demonstrated disparate treatment of Penton by the City of Hammond Police Department. Penton contends that prior to trial of this matter, he "learned" that Captain Paul Miller of the City of Hammond Police Department was actively employed while on "sick leave." Penton claims he issued a subpoena duces tecum to the City of Hammond seeking the records associated with *96 Captain Miller's leave of absence to show disparate treatment.
On June 21, 2007, four days before trial of this matter, the City of Hammond filed an expedited motion to quash the subpoena, noting that Captain Miller is not a party to this matter, and that Captain Miller's personnel, wage, and medical records are confidential and have absolutely no bearing on the issue of whether Penton was actually injured in a work-related accident herein. The OWC judge agreed, and granted the City of Hammond's motion to quash, stating as follows:
[T]he issue we're dealing with is did he have an accident on the job on September 11, 2005.... The issues you're talking about as far as is he being treated differently as far as the Attending Physician Report requirement ... I'm thinking that what you're trying to get at is maybe some other cause of action that I have nothing to do with. What I'm here today ... to go forward with is just to hear evidence and testimony on did he have an accident on the job with the Hammond Police Department ... [Miller's] medical stuff is personal and confidential ... I just don't see where it's relevant, I think it's burdensome, and his medical and personnel file is not going to help me decide whether [Penton] has proved his accident.
On review, we find no error. As the judge correctly held, the City of Hammond's treatment of its employees while out on sick leave bears no relevance to the matters at issue in this case, i.e., whether Penton sustained a work-related accident and injury as claimed herein. Moreover, given the broad discretion afforded to the trial court in discovery and evidentiary matters, we find no abuse of discretion in the OWC judge's ruling with respect to his remaining evidentiary challenge. See Testa Distributing Company, Inc. v. Tarver, 584 So.2d 300, 307 (La.App. 1st Cir.1991); Bryant v. Justiss Oil Company, 2001-832 (La.App. 3rd Cir.12/12/01), 801 So.2d 659, 662.
Penton also challenges the ruling of the OWC judge on the morning of trial, allowing the City of Hammond to introduce certain documents evidencing prior work-related accidents involving or reported by Penton. Penton objected to their introduction, claiming the documents had not been previously produced. The OWC judge overruled the objection and allowed the documents into evidence, explaining that the court would carefully consider what evidentiary weight should be given to them.[3]
*97 A review of the record shows that Penton was provided ample opportunity to fully explain the details surrounding the prior accident reports and claims. Moreover, the documents were relevant to show his understanding of and past participation in the claim-filing process. Thus, we find no abuse of discretion in allowing the admission of these prior accident forms on the morning of trial. Moreover, given Penton's opportunity to explain the circumstances surrounding the generation of these forms, we find no prejudice by the admission of these documents.
Accordingly, these assignments of error lack merit.

Challenges to the OWC's Factual Findings

(Assignment of Error No. 1)
In his final assignment of error, Penton contends that the OWC judge erred in finding that he failed to prove that he suffered a work-related accident and injuries resulting therefrom.
The employee who claims a right to collect workers' compensation benefits has the burden of proving a work-related accident by a preponderance of the evidence. McCoy v. The City of Hammond, XXXX-XXXX (La.App. 1st Cir.5/6/05), 915 So.2d 849, 850. The OWC judge's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations, which are not to be disturbed on review unless clearly wrong or manifestly erroneous. Hayes v. Louisiana State Penitentiary, XXXX-XXXX (La.8/15/07), 970 So.2d 547, 555, writ denied, 2007-2258 (La.1/25/08), 973 So.2d 758.
A workers' testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. Bruno v. Harbert International Inc., 593 So.2d 357, 361 (La.1992). Corroboration of the worker's testimony may be provided by the testimony of co-workers, spouses, friends, or by medical evidence. Magee v. Abek, Inc., 2004-2554 (La.App. 1st Cir.4/28/06), 934 So.2d 800, 807, writ denied, XXXX-XXXX (La.10/27/06), 939 So.2d 1287. Barring circumstances that cast suspicion on the reliability of the worker's uncontradicted testimony, the fact finder generally should accept the testimony as true when determining whether the worker has discharged his burden. Brown v. Kwok Wong, 2001-2525 (La.App. 1st Cir.12/20/02), 836 So.2d 315, 319. However, where, as here, the evidence leaves the probabilities of causation equally balanced, the worker has failed to carry his or her burden of proof. Magee v. Abek, Inc., 934 So.2d at 807.
Moreover, a claimant's lack of credibility on factual issues can serve to diminish the veracity of his complaints to a physician. Peters v. Harmsen, XXXX-XXXX (La.App. 1st Cir.4/2/04), 879 So.2d 157, 162. As this court has previously noted, in many cases, the credibility of the history given by the claimant to his physicians becomes as important as the medical opinions based in part on that history. Magee v. Abek, Inc., 934 So.2d at 807. The rule that questions of credibility are for the trier of fact applies also to the evaluation of expert testimony. Lirette v. State *98 Farm Insurance Company, 563 So.2d 850, 853 (La.1990).
Penton testified at trial that he suffered a work-related injury when he fell in a ditch and hit his chin during a "foot chase" of a suspect on September 11, 2005. On appeal, he contends that his failure to timely report the accident or to file a claim alleging work-related injuries should not defeat his claim, as he delayed giving notice because he was "hesitant" to report his injury and the City of Hammond Police Department "frowned" upon employees making such claims. He further contends that none of the testimony or documentation dispute that he "suffered a fall and resulting injuries." After careful review, we disagree and find that the record amply supports the factual findings and determinations actually made by the OWC judge.[4]
After carefully reviewing the medical and lay testimony, the OWC judge found that Penton failed to establish that he suffered a work-related accident and injuries, reasoning as follows:
In Mr. Penton's case, we have substantial medical records that, in my opinion, certainly don't do anything to corroborate his version of the incident. The alleged accident we're dealing with here is September 11, 2005. We have the handwritten note in Dr. Drummond's reports from September 29, 2005. In that note, 9/25/05, complaints of T-spine pain; and then it indicates that Dr. Drummond called in some prescriptions which was corroborated by his testimony.
In his direct exam concerning that phone call, Mr. Penton had indicated that he called it in as opposed to going to Dr. Drummond's office because he didn't want to take the time off from work. But my review of the payroll records indicate that he wasn't working that day. So I don't know why he couldn't have gone in to see Dr. Drummond. That was a little suspicious, in my opinion.
The first office visit we have subsequent to this alleged September 11, 2005, incident is, of course, the October 13, 2005, office note from Dr. Drummond. That indicates under History of Present Illness, "Patient comes in complaining of right arm pain that started a shoulder"I assume that means at shoulder"and radiates into his right arm and hand with some tingling and numbness with motion. Got somewhat better without patient treatment but still has flared back." There's no mention whatsoever of a work-related accident.
The Attending Physician Report from that dateI guess we're calling it the APRthis is the main thing, in my opinion, that casts the most serious doubt upon this whole alleged incident. There's clearly a spotwe've been through this over and over again with various different witnesses. There's obviously on the APR a place for Mr. Penton to fill out injury/illness and then, again, did the injury occur while on duty. He has the option of yes or no. He didn't circle either. But then did the illness occur while on duty, he circled specifically no.
I think in his testimony, the way he tried to explain it was he didn't realize the seriousness of the injury at the time. *99 I guess the problem I have with that is in the doctor visits and all the APR's after that datenot all of them but the ones closest in time after that, he's still given this option every time to[,] of his own volition circle, yes, it did occur at work, illness or injury, whatever you want to call it. And he didn't do that. He just kept checking "injury".
Also the thing that cast doubt upon that testimony is as of his next visitor as of October 24, 2005, APR Dr. Drummond had clearly indicated he had a herniated disc. The part that the physician fills out, No. 5, nature of illness or injury, herniated disc, neck pain. So I think as early as 10/24/05, he realized the seriousness of his alleged injury.
Then, you get into the problem of Dr. Chiasson's reports. This is the orthopedic surgeon. And I've looked through these reports several different times, and I can't see anywhere in any of these visitsstarting with November 1st of 2005, there's no mention of a work injury or an accident of any type. Then November 11th, there's no mention of an accident or injury. And all the way through Dr. Chiasson's reports, I can't find anywhere that he's told him about an injury.
On the February 17th, 2006, office note, Dr. Chiasson relates in the history and physical, [h]e states he has had improvement of symptoms. He continued to complain of tension ... type headaches in his neck but he states he is ready to return to work". Then Chiasson's visits that I reviewed where I can't find any mention of an accident or an injury, November 11, 2005; December 12, 2005; January 10th, 2006, no mention of an accident.
Then I'm reading Dr. Burdine's reports.... Plaintiff's Exhibit 4. This is his visit to Dr. Burdine January 10, 2006. History of Present Illness, "Timothy describes the pain as aching and throbbing. He rates his pain a 4 on a 1 through 10 scale. Timothy states his pain is intermittent. He states his pain started five months ago. The pain occurred after a fall." There's no mention that the fall occurred at work.
And then January 10, 2006, I believe is the first timeaccording to the records we were looking at during the testimony, that's the first time that the "injury while on duty at work" that he circles yes. It looks like the date that Mr. Penton put in was January 10, '06. Dr. B. Chiasson is supposedly the doctor. I can't see the physician's signature but [its] dated 1/16/06.
And then again we got into the situation I think Assistant Chief Corkern was alluding to. Chiasson's record[s] seemas far as the way I'm reading them, it seems that Mr. Penton showed up at Dr. Chiasson's office and told him that he was ready to go back to work. That's when Chiasson on 2/17/06 indicates he has improved symptoms and he's ready to return to work on 2/21/06.
Yet the very next day on 2/[2]2/06, Dr. Daunis' narrative, that's when he actually states that he was chasing an individual at work and he fell forward. So I can't really reconcile that in my mind why a patient would go in and tell a doctor that they're ready to go to work without ever having mentioning to this physician, I fell, I was on duty, I was chasing a suspect, it was on the job, but then the day after he's supposed to be released to return to work Dr. Daunis' reports indicate a pretty substantial history of this alleged chasing an individual and falling during that chase.
The medical, again, I don't find any amount of corroboration in these medical reports. I'm even a little suspicious *100 of Dr. Drummond's deposition testimony in that, you know, we're confronted with a set of medical records that he filled out and filled in, I guess, based on Mr. Penton's history.
And it's clearly in conflict with Dr. Drummond saying in his deposition which is, "I know it's not in the report. I just know he told me that he was chasing a suspect and he fell." I find that, you know, a little bit hard to believe. I can't imagine that Dr. Drummond would leave something of that nature out of that initial report when he saw him on October 13th of 2005.
As far as corroboration, also there's no corroboration in the deposition testimony of the other officers that were on the scene with him, the deposition of Officer Gautier or the deposition of Rodney Gemar. And obviously Captain Miller and Assistant Chief Corkern couldn't corroborate any of thisany of the details of this alleged incident on September 11, 2005.
And as far as Ms. Severan's testimony, I was very persuaded in her testimony on the point where she said something about, you know, I thought this was unusual, that's why I drafted the notes. And Mr. Stelly asked why it was unusual; and she said, you know, because he had reported all his prior accidents.
So, you know, Mr. Penton is obviously not a Workers' Compensation novice. I thinkyou know, I can't really give him the benefit of the doubt in, I guess, believing any reason why he chose not to report it immediately, why he chose to kind of hold back because there [are] some other issues going on at work. I think given his very recent January 2005 injury, it's a little bit hard for me to believe that he didn't know the routine, he didn't know the drill that he was supposed to report it promptly to all the people that needed to get involved.
Also my review of the payroll records, the time sheets, I don't see where he missed any work between 9/11/05 and 10/2/05. So I'm looking at the period ending September 18, 2005, this obviously is the time period when everyone, I guess, would agree that they were working 12-hour shifts and they just divided it up into day shift and nightshift.
Let's see. September 11th was a Sunday. So from September 11th through Saturday, September 19th, he's worked 12-hour shifts on Saturday, September 17th he worked eight hours, and then it looks like four hours overtime pay; and then on September 19th, the notation on one page somebody handwrote in, September 19th, '05, 12/6. So it appears he may have worked 12 hours regular on that date and then six hours overtime.
And then that following pay period through Sunday, October 2nd, he's working six-hour shifts, eight-hour shifts. But I guess the whole point is there's noI don't see any sick time requested or any indication that he had to take off for anyanything, illness or injury, through October 2.
I was a little, I guess, unconvinced I suppose when Mr. Penton was being questioned about his earnings. I found that he was fairly evasive about this money that he supposedly earned detailing cars. You know, I just didn't feel like we ever could really get a straight answer even of a ballpark figure until after the question had been asked several times. I didn't find he was very forthcoming about that particular issue.
So based on the failure to have any medical or lay corroboration of this alleged incident, and some credibility issues I had with Mr. Penton's testimony, I'm going to render judgment in favor of *101 the City of Hammond Police Department and against Mr. Penton. I'll dismiss the claim with full prejudice. I will have everybody just pay their own costs. I'm not going to assess costs on this one. We'll just call it a dismissal with prejudice. And that's it.
The credibility of a witness is best determined by the trial court judge. Hooper v. Louisiana Department of Agriculture and Forestry, 2005-2481 (La.App. 1st Cir.3/23/07), 960 So.2d 148, 153. The "manifest error-clearly wrong" standard of review demands great deference to the trier of fact's findings regarding the credibility of witnesses, because only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Lirette v. State Farm Insurance, 563 So.2d at 852.
While, in some cases, a claimant's testimony alone may be sufficient to discharge his burden of proof in proving a work-related accident, herein the OWC judge found that other evidence presented provided no support or cast serious doubt upon the claimant's version of the incident, and found that the claimant's testimony was not corroborated by the circumstances following the alleged incident. See Bruno v. Harbert International, Inc., 593 So.2d at 361. Accordingly, the OWC judge found the claimant's uncorroborated testimony herein was insufficient to meet his burden of proving a work-related accident.
After a thorough review of the record and evidence in this matter, we find a reasonable factual basis exists in the record for the OWC judge's conclusions. Thus, we cannot conclude that the judgment dismissing the petition was manifestly erroneous.
This assignment of error lacks merit.

CONCLUSION
For the above and foregoing reasons, we affirm the July 13, 2007 judgment of the OWC. Costs of this appeal are assessed against the appellant/claimant, Timothy E. Penton, Jr.
AFFIRMED.
GUIDRY, J., concurs.
NOTES
[1] Penton later claimed that after the alleged accident, he experienced soreness and pain in his neck and shoulder on his right side, and that the pain continued to worsen. On September 29, 2005, Penton contacted his primary care physician, Dr. Maury Drummond, by telephone and stated he was in pain. He did not report for a visit, but Dr. Drummond's office phoned in prescriptions for pain medication, a muscle relaxer, and an anti-inflammatory medication and advised him to follow-up if he continued to experience pain.

On October 13, 2005, he went in to see Dr. Drummond at his office. Dr. Drummond's notes from that visit indicate that he presented with complaints of right arm pain that started in the shoulder and radiated into his right arm and hand with some tingling and numbness with motion. Notably, there is no mention in Dr. Drummond's notes of any injury occurring from a work-related accident. At that visit, Dr. Drummond recommended that he undergo an MRI scan of his shoulder and cervical spine, which scans revealed a herniated disc at C6-7, consistent with Penton's complaints of pain. Dr. Drummond restricted Penton's activities, placed him on leave from work, and referred him to Dr. B.J. Chiasson, an orthopedic surgeon, and Dr. Anthony S. Ioppolo, a neurosurgeon, for further treatment.
However, on the Attending Physician's Report ("APR"), a form employees were required to submit regarding doctors visits, on his initial visit with Dr. Drummond on October 13, 2005, when asked if the doctor's visit was due to injury or illness, Penton did not check either blank. Likewise, where the APR asked if the "injury" had occurred while on duty, Penton did not circle "yes" or "no." Also, where the APR asked if the "illness" had occurred while on duty, Penton circled "no." Moreover, on APR forms submitted for various subsequent visits, although he checked that the reason for the visit was an "Injury," he did not indicate on the later forms, when asked, that the injury occurred "while on duty."
Dr. Chiasson indicated by letter dated November 29, 2005, that he was treating Penton for a herniated disc at the C6-7 level, that Penton was undergoing anti-inflammatory use, cervical traction and physical therapy, and that Penton would be "out of work" for approximately four weeks. On a February 7, 2006 APR submitted by Penton documenting a visit with Dr. Chiasson, and also by letter dated February 17, 2006, Dr. Chiasson indicated that Penton was released to return to work, "full duty with no restrictions" as of February 21, 2006. In a letter dated February 9, 2006, Dr. Chiasson noted that Penton was scheduled to undergo epidural steroid injections to his cervical spine and opined that upon completion of the injections, Penton would be able to return to work. Penton testified that Dr. Michael Burdine performed the epidural injections. Notably, none of the above letters, including a letter dated November 1, 2005, to Dr. Drummond, ever indicated that Penton's injures resulted from a work-related accident.
Nonetheless, the City of Hammond requested that Penton be evaluated by Dr. Mark Daunis, who evaluated Penton on February 22, 2006, the day after he was released to return to full duty work with no restrictions by Dr. Chiasson. Penton told Dr. Daunis that he had been injured while "chasing an individual at work on 09/11/05, [when] he slipped on a flat surface and fell forward," and claimed that he was unable to return to work.
An APR dated February 28, 2006, documenting a visit with Dr. Ioppolo, showed that Penton was released to return to work as of March 1, 2006, but only for "sedentary work." In a "Work Status" note dated March 1, 2006, Dr. Ioppolo issued "permanent restrictions," limiting Penton to "inside work" only and restricting him from climbing ladders and lifting anything over 20 pounds. Dr. Ioppolo reported that Penton had a C5-6 disc herniation and that he may need possible surgery if his pain became intolerable.
[2] Penton was off from work on sick leave from October of 2005 through October of 2006, during which time he was paid his full salary by the City of Hammond in accordance with civil service laws, which entitle a civil service employee up to 52 weeks of sick leave.
[3] Penton contends that the OWC judge erred in admitting into evidence documentation of his prior workers' compensation claims or forms and reports prepared by his superiors, contending that these documents had been requested in discovery, but were not produced by the employer/carrier until the morning of trial.

The City of Hammond counters that the admission of these documents was proper, as Penton was provided an opportunity to testify as to his knowledge of the reporting process and his knowledge of any prior reports filed on his behalf. The City further contends that Penton was allowed the opportunity to explain his thought processes concerning the prior reporting of claims, as well as his reasons for delay in reporting the instant claim.
The documents included: (1) a copy of an accident report dated January 18, 2005, completed by Sgt. C. Schaerer, where Penton broke a finger and suffered a laceration on his left knee when he fell while chasing a suspect; (2) a copy of an accident report dated June 9, 2003, signed by Penton, where he suffered an injury to his left wrist and elbow and hip while attempting to arrest a suspect; (3) a copy of an accident report dated September 30, 2002, completed by a sergeant, noting Penton suffered pain and swelling in his lower back after moving a heavy gun case in the trunk of his vehicle; (4) a copy of an accident report dated July 29, 1999, completed by Lt. Donald Day, after Penton closed his vehicle door on his hand; and (5) a copy of an accident report dated June 5, 1997, signed by Penton, where he broke his right thumb in a scuffle with a suspect.
[4] Contrary to Penton's characterization of the testimony, although his fellow officers involved in the chase that night, i.e. Officers Gautier and Gemar, may have witnessed his fall during the chase, neither of the officers were aware of any purported injuries sustained by Penton or alleged to have resulted from this incident until they were contacted about providing a statement in relation to his claim months later.